Case number 20-5076. Feng Wang and his child et al. Appellants versus Michael R. Pompeo in his official capacity as U.S. Secretary of State et al. Mr. Ramos for the appellants. Mr. Glover for the appellants. Good morning, counsel. Mr. Ramos, please proceed when you're ready. Good morning, your honors. It may please the court. This is Edward Ramos on behalf of the plaintiff appellants. There are a number of textual and structural reasons why the statutory framework at issuing this case does not require that the spouses and children of EB-5 investors use up the annual allotment of EB-5 visas. And I hope to discuss a few of those in my time this morning. But with the court's permission, I'd first like to focus on our APA notice and comment argument, because we think that may provide actually the easiest basis for the court to decide this case. The APA requires agencies to promulgate legislative rules through notice and comment. And the State Department here violated that requirement by adopting its policy of counting spouses and children of EB-5 investors without going through the appropriate notice and comment procedures. Now, the government claims that it did in fact promulgate this policy through notice and section 32E. But if you look at the text of that regulation, your honors, you'll see that that regulation doesn't address the critical counting question at the heart of this case. In fact, subsection E2, which is the provision that deals with the spouses and children of investors, describes those spouses and children as receiving their status, quote, pursuant to section 203D, which is the equivalent of 1153D in the AUSC site. And the language of that subsection is consistent with our position that spouses and children receive their status under section 1153D and not the EB-5 preference category, which is subject to the worldwide limit at 1153B-5. And any question on that point is resolved if you contrast the regulation on the one hand with the Foreign Affairs Manual on the other hand. And we cite the Foreign Affairs Manual provision at page 50 of the Blue Brief. And that provision very clearly announces the counting policy. It says in no uncertain terms that derivatives, quote, count against the numerical limits. But the problem, of course, is that the Foreign Affairs Manual is not a regulation. It was not promulgated to the notice and comment procedures. And the public had no opportunity to provide feedback to the State Department as to whether or not the counting policy is a sensible one. Can I ask you this question? If I read the statute to dictate that derivatives are subject to the numerical caps, then does the regulation matter? Does your argument about the procedural argument about the regulation matter? No, Your Honor, you're right. If the court agrees with either our contention that the statute unambiguously prohibits the counting of derivatives or with the government's position, then there wouldn't be any occasion to reach the APA question because the statute would dictate the only way that the agency could do things. But we would contend at a minimum that there is ambiguity in the statute. Before we get there, can I ask you in the regulation 42.32E2, when it says a derivative status corresponding to the classification of the beneficiary of the petition, what does that mean to you? Does that mean that they're getting an E-5 visa? No, Your Honor. The status, in our view, refers to lawful permanent residence status, not the status referring to the particular classification. And I think the reason that it may refer to the is that there actually are two different forms of lawful permanent residency. You have lawful permanent residence status on the one hand, and then for EB-5 investors and certain spouses, you have additional lawful permanent residency. And so our view is that status refers to, not to the particular preference category, but to the... I'm wondering about the classification. The classification does refer to the particular subsection under either 1153B1, B2, B3, B4. It also says if they're not otherwise entitled to an immigrant status. So it sounds like there's no other source. And if under your theory, D3 was an independent source, why would it say if you're not otherwise entitled to an immigrant status, then you'll have a derivative status corresponding to the classification of your principal, to cut out some extra words there. If you're corresponding to the principal and you don't otherwise have a status, but your theory seems to be they otherwise do have an independent status separate from the principal. So is your honor referring to the regulatory argument or to the statute? Right now I'm talking about the regulatory argument, although a lot of the language is similar in the statute. I'm just trying to figure out how you piece these words together structurally if you aren't otherwise entitled to an immigrant status. So you'd have no independent... I think that language to me means, and tell me how I'm reading it wrong. I have no independent source for my status to come into or remain in the United States. And so I will have a derivative status. I have no independent one. I'll have to have a derivative status. That means it derives from somebody else. And then the regulation and the statute does the same thing says what I'm going to derive is the same classification EB5 as the principal. So your honor, in our view, in our view, status refers to lawful permanent resident status or conditional lawful permanent resident status. And the point about it not having that status, you have to have the visa. I don't know how you can separate that out from the visa. That's a visa that gives you that status. So your honor, this is all about getting visas here. So it can't be assuming you're already post visa visa and then a lawful permanent resident status. Right. So the particular classification leads to all of these different employment-based and family-based preference categories lead to one of two statuses, either lawful permanent resident status or conditional lawful permanent resident status. And our principal contention, your honor, is that status more naturally refers to either of those two statuses, conditional lawful permanent residency or lawful permanent residency rather than the particular classification. No, I understand that part of your argument. I'm asking is how you get there because that's what's central to your argument is how do you get to that status if you are a family member or child, a family member, I was going to use family member for a shorthand. If you're a family member, how do you get to that status? And it's through obtaining a visa and the regulation. I'm just saying the regulation says that if you're going to get that, you can't have an independent source. Right. So I think if you have an independent source, you go use that. Right. I think that's right, your honor. Okay. So you must be using a derivative as a statute says source. Right. And derivative means it comes from something else. And that would be this classification, the same classification as your principal. So, right. So, but by virtue of 1153 D, in other words, section 1153 D confers, says that the spouse or child is entitled to the same status in the same order of consideration. And so the question is, I think the critical question. I'm just taking on the regulation, it's also classification so that you piggyback, you're piggybacking essentially. You don't have an independent source of obtaining a visa and getting the status. I don't care whether it's conditional or not for these purposes. You have to piggyback on someone else, the principal. Right. I think that's right. But the critical question is whether or not for the purposes of the regulatory argument, whether the visa is the person obtains their status pursuant to 1153 D or 203 D. But if you're piggybacking, I don't understand how you're not obtaining it through the operation of EB-5. So you don't have any, your argument sounded like D-3 was an independent source, but it's not an independent source. It's a piggybacking source. It's a derivative source. And so why isn't the natural language, particularly using the word classification here in this regulation, doing the work that the government says it is? It says you're piggybacking on EB-5 status. You're getting an EB-5 visa. So Your Honor, I think I have a few responses to that. One is that the language of the regulation is by no means clear at a minimum because at section E-1 and 2, E-1 talks about entitlement to status. And that presumably refers to the lawful permanent residency or conditional. And then the derivative status just means that the spouse or child, they obtain that same status, but by virtue of the relationship to the EB-5 investor. But that doesn't mean that they obtain the visa under section 1153 B-5. And just to take a step back, if Your Honor looks at the regulatory history, there was commentary to both the proposed rule and the final rule here. And the government in the State Department, when it promulgated the rule, never recognized the key structural change that was part of the 1990 Act. And so the regulation- When a family member fills out their visa application, the application form requires you to check a box for which type of visa you're obtaining. Including one of those options is employment-based, the EB-5. And so when the spouse fills out that form and says, what kind of visa are you getting? They check a box that says EB-5. There's no D-3 option on there. Is that correct? As a matter of just factually, because the State Department takes the position that spouses and children obtain their status under the EB-5 classification, I think that's correct, as a matter of fact. I think under our reading of the statute, that is not a correct way- When they get a visa, when they actually obtain the visa, not the application form, do visas actually indicate which type of visa they are? Again, as a matter of just simple fact, I think the answer is yes. But as a matter of statute, I'm not aware of any statutory provision that requires that the visa itself indicate the particular status. And our position is that under the best reading of the statutory framework, the visa is issued under the derivatives provision rather than the capped EB-5 section. And if I could point the court just to one reason, moving to the statutory argument very briefly, because I see I'm running short on time. The Congress, when it wanted to explicitly require the counting of derivatives, knew exactly how to do that. And I think if you look at the 1980 Refugee Act, you'll see that contrast very clearly. The 1980 Refugee Act borrowed language that was virtually identical to the derivatives provision at issue here. And it was in a separate section, an independent section, that was not subject to the worldwide limits on refugee admissions. And yet it included an express sentence there that the spouses and children of refugees count against the limits. And that's exactly the language that- Do you know what the practice was before the 1980 Refugee Act? For refugees? Yes, when they added that language, were they changing something? Were they doing, carrying forward what they were doing before that with respect to refugees? Your Honor, I don't know the answer to that, Your Honor. I'm sorry, I don't know the practice before 1980. That was the section that codified, essentially, the refugee practice. But I'm not sure what the answer to that is. I apologize. I would like- Mr. Hermos. If we accept the reasoning of everything you brief with regard to the reg, with regard to everything, is it possible to confine it just to EB-5? Your Honor, we don't take a position one way or the other on that question. Let me tell you why I ask. Assume for the moment that I think there's some force to your argument. But its consequences seem huge if it's not confined to EB-5, or at least confined to EB-1-5. So tell me, is there a way to limit it, to at least limit it to just the employment-based category and not the family and diversity? Tell me if there's a way to limit it just to EB-5. Or if, in all candor, there's no reason to limit it, the logic of your argument goes just as much to family-based, the other EBs, and diversity as EB-5, then I want that answer. If that's the answer, I want that answer. Mr. Hermos. Okay. Sure, Your Honor. So I think I have two responses to that. The first is, I don't have a fully fleshed-out theory for how it could be limited to the EB-5 category, but I would point to a few features of the EB-5 program that I think could provide perhaps a basis for distinguishing it. One is the job creation and the economic growth function of the EB-5 program. And in other words, the EB-5 program is unique in the sense that it really was structured to try to generate jobs and generate economic growth in the United States. And it would be strange to think that Congress would have intended to dilute that job creation and economic growth potential simply by virtue of the happenstance of the number of spouses and children that happen to tag along with the investors. And there's also some language that's specific to the EB-5 program, in particular, the provision for removal of conditions for EB-5 investors two years after they enter the United States, they have to file a petition to remove conditions. And that statute distinguishes between the EB-5 investor who obtained status under section 1153B-5 and the spouses and children who obtained their status by virtue of their relationship to the investor. How does it distinguish between them? Just the statute itself, the provision that governs removal of conditions, excuse me, let me just pull up the provision. On the one hand, it describes investors obtaining status, quote, under section 1153B-5. And then on the other hand, it describes their children, the spouses and children as, quote, obtaining status by virtue of being the spouse or child. But to answer, I think, Your Honor's larger sort of floodgates question, particularly if the court were to rule on the APA ground, it would be open to the government to promulgate its counting policy through notice and comment. And the State Department has been known to quickly promulgate interim final rules. And we don't see any reason at this juncture why it couldn't do that in this that this was the better reading of the statute. And so we would just urge, particularly if the court finds that there's ambiguity in the statute at a minimum, which, you know, we think that the briefing at least establishes that much, that the court should remand on that issue so that the department goes through those required APA notice and comment procedures. And I see I've gone far over my time. I just want to follow up on that, on your structural argument, statutory structure. Yes, Your Honor. And textual argument that there's no limit or the limits don't cross-reference D3. Would a regulation that counted family members, derivative family members against the caps be a lawful regulation? Well, again, our principal contention, Your Honor, is that no, that the statute unambiguously prevents. But if the court were to find ambiguity in the statute, then I think we would be forced to concede that. Your position is that it's not ambiguous in this regard. And so anyone who's in D3, which can't be confined to EB5 or even E, can't count against limits. Is that correct? Well, Your Honor, if I understand. Your position. Our principal position is that the statute mandates that outcome. But if I were to, I mean, I think we have to acknowledge, for example, that the word status, if there were going to be ambiguity in the statute, I think it would turn on the word status, because the word status in 1153D is not a defined term in the INA. The INA has a definitional section, 1101, and status doesn't appear there. And so the real bone of contention here is, on the one hand, the government claims status really refers to visa classification. Our contention is that the better reading is that it refers to lawful permanent residence status or conditional lawful permanent residence status. And if the court were to find that that was, in fact, ambiguous, then I think we would be forced to concede that the government can resolve that ambiguity through notice and comment rulemaking. But you don't think it's, but Mr. Rao, I mean, I get that that's the narrowest approach to resolving the case, but it's also an approach that you don't think is correct and that the government doesn't think is correct. So the only way to reach any of the notice and comment regulatory somewhat narrow consequences is to adopt an interpretation of the statute that no party in the case actually agrees with. Well, Your Honor, the AP, I want to be clear that the APA notice and comment argument, although it's not our principal argument, it's a fallback position. Right. That if the court rejects our principal contention, that the statute unambiguously requires the spouses or prohibits the government from counting spouses and children against the limits, then at a minimum, we believe there's ambiguity. And in that case, the APA notice and comment argument kicks in. I just wanted to clarify one more thing because I think I was just confused. It sounded to me from your reply brief that you agree that even if there are these 12, I'm just going to call them 12 D3 visas, the D3 dependent or derivative visas, dependent family visas. Okay. They are, whatever you want to call it. I don't, I do D3. The derivative for B. Okay. I got it. Your structural argument, that's a separate section, that they are subject to the worldwide limits, but not to the country limits. So that's right, Your Honor. And the per country limits, I think you're the section, the INA section is 202 and 1150, I think 1152. Yes, that is our position. And if I could clarify our position on the per country limits, there's no question that the per country limits cover some spouses and children because there are specific, as the there are chargeability provisions that talk about how spouses and children should be counted against the per country limits in cases where they're of different nationalities. But those spouses and children are not the spouses and children of EB-5 investors, or there are certain spouses and children who are themselves defined as principal immigrants. And in particular, that the special immigrant category under 1153-B-4. And the major one is religious workers. And religious workers are defined at 1101-A-27-C. And there's a couple of other ones that are cited at page 16 of the reply brief. But they're defined to include the actual principal category is defined to include the immigrant spouse and children. And so those are the spouses and children that are covered by the per country limits. And that's made clear. I think if you look at section, I believe it's B, subsection B of 1152, it explicitly states that the per country limits only apply to people that obtain their status under 1153-A-B. In other words, the family and the employment based capped categories. And spouses and children of EB-5 investors fall under D. Okay. Thank you. I'll make sure my colleagues don't have further questions for you. At this point, Mr. Ramos, we'll give you some rebuttal time. Thank you, Your Honor. Sure. Mr. Glover? Excuse me. Good morning, and may it please the court. I'm Matthew Glover, and I represent the State Department. I'd like to start with the statute's text and structure. And I confess I'm a little confused about the last answer Mr. Ramos gave to Judge Millett. I believe he said that they think that the derivative visa applicants, or I think the term Judge Millett was using was 1153-D visa applicants would be subject to the worldwide limits. And the worldwide limits are set forth in 8 U.S.C. 1151 titled worldwide limits. And so if he's conceding that, and I didn't understand that to be his position, but that would mean that the derivative visa applicants must take a visa from one of the limited categories. And at 1151-A, and this is part of our textual and structural argument, 1151-A says exclusive of aliens described in subsection B, aliens born in a foreign state or dependent area who may be issued a visa or may otherwise acquire status as a lawful permanent resident are limited to. And then A-1 is family sponsored immigrants, A-2 is employment based immigrants, and A-3 is the new category of diversity immigrants. B includes some exceptions, the most notable being immediate relatives of U.S. citizens and some special immigrants. And then 1151-C sets forward the numerical limitations that the title is referring to for family sponsored immigrants. And then D sets forward the worldwide limitation for employment based immigrants. If he's agreeing that derivatives are subject to these worldwide limits, that would mean the 140,000 limitation in 1151-D applies not just to the employment based immigrants, but also to their derivatives. And if you look at 1153-B, which sets out the categories of employment based immigrants, it sets out for each one a percentage of this number 140. And I'll clarify, and I apologize if I'm getting too into the weeds, but 1151-D has 140 plus a second number, and that second number equates mathematically to leftover family based immigrants. So if the family based demand for family based immigrants does not meet the 480,000 cap in a given year, those leftover from that year are added to next year. It's sort of circular because if employment based doesn't hit it, the leftover are added. My understanding is it almost never happens that there's leftover. So that's why I'm just keeping the 140 for purposes of clarity. But that 140 is then broken up among the B1 through 5 sections by percentages that equal 100%. So if derivative EB5 derivatives are taking visas from the worldwide limit in 1151, they must be taking it from one of those percentage categories. Naturally, that would be from the B5 percentage category. And I think if I can step back, this meets our textual and structural argument. Historically, since 1921, Congress has limited with a quota system, the number of immigrants entering the United States. And in the INA, the Immigration Nationality Act of 1965, it set a maximum cap in 1151A of 170,000, with certain exceptions. And up through 1988, which is preceding the 1990 Act, that number actually had gone up to 270,000. But it then in the 1965 Act had 1153A and A1 through 6 set out 1 through 7 set out a number of categories and percentages. 8 was a catch-all. And then 9 was the exact same language for treatment of spouses and children accompanying or following to join. And so those people were taking visas out of the overall worldwide cap of 170 and later 270. The 1990 Act did sort of a structural overhaul and put in this provision I was speaking about in 1151A saying immigrant visas are limited to family-sponsored, employment-based, and the new diversity category with certain exceptions. If they had intended to have an 1153D diversity or derivative visa that was not supposed to be part of the caps, you would have expected them to do one of two things in 1151. Include it in 1151B in the groups that are not subject to the numerical limitations in A. Or at least have in A listed a fourth category of immigrant visas are limited to family-sponsored, employment-based, diversity, and then a D derivative. But they didn't do either of those things. They kept the same language that they had had in the 1965 statute. And I think they changed the gender of one of pronouns and added a title to it when they moved it to 1153D or a subtitle I think would be the right term but treatment of family members. And I think that if turning to 1153 that's another textual indication that 1153D is not intended to create an uncapped or not subject to worldwide limitation pool of visas. 1153A is titled family-sponsored immigrants specifying those immigrants specifying the immigrants that are coming under that provision. And C is diversity immigrants. D is treatment of family members. It's not derivative immigrants or some new category of immigrants. So it repeats the prior language. And I would note that we noted two bills in our in a footnote to our brief. Congress has multiple times in recent years taken up bills that would have added to 1151B a provision saying, you know, 1151B the exempted categories it would add one stating, let me get the exact language, the exact language from the Border Security Economic Opportunity and Modernization Act of 2013 cited in our brief. The language would have been to add to 1151B a new category titled H derivative beneficiaries as described in section 203D of employment-based immigrants under section 203B. So that would have been a specific way to have exempted only employment-based derivative immigrants from the worldwide caps. But Congress didn't, it didn't enact that. That was also proposed and we call it the I squared. I think it's also known as the Immigration Innovation Act of 2015. There was also an Immigration Innovation Act of 2017 and 2013, all of which proposed that sort of language. And in addition, stepping back to the broader structure, in the 1990 Act, Congress took the worldwide level of immigration from 270,000 immigrant visas to three categories, 480,000 family-based immigrant visas, 140,000 employment-based immigrant visas, and 55,000 diversity-based immigrant visas. So it increased the worldwide level from 270,000 to about 675,000. If it had created an uncapped category of derivative visas, using the math that the conference committee used when they were comparing the House bill, which didn't count derivatives, to the Senate bill, the conference committee's math was that the House bill had 75,000 principal employment-based immigrants, and that would equal 187,500 total. So they were using a 1.5 multiplier that each immigrant would bring on average 1.5 derivatives. Using that math, on plaintiff's reading in the 1990 Act, Congress took the worldwide level of immigration from 270,000 to 675,000 in these three categories, but also created an uncapped category that it expected to include 1,012,500, using that 1.5 multiplier, derivative immigrants. But it was silent about this category of 1,000,000, and it didn't even include that category of 1,000,000 in the exempted 1151B. Can I ask you about their argument about the Refugee Act and how it specifically counts family members? Do you know what the practice with refugees and family members was before 1980? Was that codifying the existing practice? Yes, Your Honor. So I have a secondary statute that I think will help flesh this out when you were asking my colleague about that. So refugees, sorry, if I can go back to describing the 1965 Act, Section 1153A had provisions one through seven that were categories. Refugees were actually that A7 category. Then there was A8, which was a leftover, and A9 was derivatives. The Refugee Act of 1980 was passed. It took out A7, so what was A8 in 1965 became A7, and what was A9, the derivative provision from 1965, became A8. It took out A7 and created a new statute with a new cap. So refugees were previously taking immigrant visas under the worldwide cap of 270,000, and now they were taking them under this new separate statute and statutory structure. And so there they did choose to note that they were including them, but one of the reasons may have been because a derivative, a spouse or child of a refugee is not themselves meeting the definition of refugee. If I could also point out, they cite in page 12 of their reply brief some other statutes that provide for immigrant visas that aren't in 1151A. One of them precedes the 1990 Act. It's the Cuban Refugees Act. That statute allowed for Cuban refugees who reached the United States to in the year they cite, said that those Cubans did not count towards the A7 refugee total, and there was a time period at that at some point expired. And I'm sorry, I don't have printed out with me the various copies of the bills, but in 1976, Congress passed another bill before the 1980 Refugee Act saying that the Cuban refugees again would not take out from the then A7 refugee cap that was coming out of the worldwide limit of 270. So I think in creating this new refugee structure, Congress did choose to enumerate there. But in looking at the treatment of worldwide caps and the treatment of derivatives under 1153, we think that when Congress repeated the same language and moved it to a new D section treatment of family members, it didn't mean to silently create some new uncapped category of visas. And an additional indication of that in the 1990 Act is that the treatment of family members was in section 162 of the Act, which is titled conforming amendments. And so it was conforming to the prior, you know, use of language relating to derivative spouses. If I could also highlight in response to the other statutes they point to in their reply brief, you know, they are correct that Congress has created other statutes that allow you to get immigrant status that's not, that aren't the three family based, etc. in 1151A. But when it does so, Congress includes language and I'll start with the first one they list, the Liberian Refugee Immigration Fairness Act. It's section 7611 of the National Defense Authorization Act of 2020. Section 7611H says, is titled no offset in numbers of visa available. And then says the Secretary of State shall not be required to reduce the number of immigrant visas authorized to be issued under any provision of the Immigration and Nationality Act to offset adjustment of status of an alien who has been lawfully admitted for permanent residence pursuant to this section. And it uses similar language in the Haitian Adoptees Act that they cite in the Indo-Chinese Parole Adjustment Act of 2000, in the Haitian Refugees and Fairness Act of 1998. And if I can highlight the Nicaraguan Adjustment and Central American Relief Act, it's known as NICARA, that they cite of 1997. It did two things. It also included this no offset in numbers. But interestingly, NICARA, and I apologize, I know the court doesn't like acronyms, but NICARA reduced the number of diversity visas available from 55,000 to 50,000 to account for these new refugees that were going to be available under that act. And it also reduced by 5,000, the number of visas available under 1153 B3A Romanet III, which I think is a skilled labor section. I'm not sure which one. But that just gets to the point that when Congress is choosing to create immigrant visa categories that aren't in 1151 A, B, and C, it usually sets a of Congress having also- What I'm curious about is, I mean, so you've done an argument here that's a very, you know, elaborate exercise in statutory construction, all kinds of statutory construction principles. But, you know, we're piecing together a lot of different statutes here. And maybe the piecing together is ultimately right for one side or the other. But it's not plain language in the way it was before the 1990 Act. And so, and you can interpret it. I understand your arguments for your interpretation. I understand their arguments for their interpretation. But State Department's never done a regulation that says, here's what it means. We're the experts in piecing this together. Visas, that's our wheelhouse. Let's explain to you how, why we're doing this. So what about their argument that, at a minimum here, if you're adopting this interpretation, and if it's to be deemed reasonable and get deference, you should have promulgated a regulation, and you didn't? So, Your Honor, I would have two responses to that. The first, and I'll get to the regulation, but the first is that we think that this is clear from the statute. And as you said, I use a number of interpretive texts. We think this is the best reading of the statute. But if you were to say the statute's ambiguous, we do think 42 CFR 4232 does make this clear. And it's clear from a provision. The regulation issued the 22 CFR. If I can walk through that briefly with you, and I'll take a quick drink if you don't mind. I know my time is expiring. Thank you, Your Honor. So, if you look at 22 CFR 4232, it's in subpart D of Title 42, which is foreign relations. Part 42 is visas documentation. Subpart D is immigrants subject to numerical limitations. So again, it's talking about those immigrants subject to the limitations in 1155A, which is the worldwide limitations. And in the 4232, employment-based preference immigrants, the opening clause, which applies to everything below it, is identical to the opening clause that was in 1153A under the 1965 statute. Aliens subject to the worldwide level specified in 201D, except it's now 201D because 1155D sets the employment-based specific, 1151D sets the employment-based specific limitation. It used to be subject to 1151A because A had the worldwide just single cap. So, that has changed the statute citation. But aliens subject to the worldwide level specified in 201D, which is that 140 employment-based visas for employment-based immigrants in a fiscal year shall be allotted visas as indicated below. So, the regulation tells us that that 140,000 pool are being allotted to these people in these categories as indicated below. And so, we think that's very plain that they're counting towards the 140. And as you were discussing with my friend on the other side, and I apologize, I didn't stop at the red light to ask if I could proceed. In the section E, fifth preference employment creation immigrants, that's telling us that the people under here are the people who are going to be taken from the worldwide limit in 1101D for section E, which is 1153BE, employment-based immigrants, 7.1% of the overall 140,000, or as it comes to now, 9,960. The people taking up those 9,960 visas are entitlement to status and alien classifiable as a fifth preference in one. And then two, as you were discussing with my colleague, Judge Millett, entitlement to derivative status. And if otherwise, entitled to a visa. So, as you were saying with them, they derive it. They're entitled to a derivative status corresponding to the classification, EB5, and the priority date of the beneficiary of the petition. So, we think the regulation is very clear that this is a regulation for those subject to the worldwide cap for employment-based immigrants. And here, and they place the derivatives for each section under that subsection, telling you it's subject to that Does the State Department have the authority to create new visa categories, or can only Congress do that? I believe only Congress can do that, but I confess it's not something, I guess, I would say, given the language of 1151A, that for at least, if I can say for immigrant visas, I confess, I didn't look at the language for non-immigrant visas. But, you know, the 1990 Act, when it setting for three categories of, those are where the immigrant visas come from, unless you're exempted in B. The State Department can't add to B, unless it was later given statutory authority. I've seen no statutory authority, and so I'm not aware of any. I know I'm in the red light. If I could make two brief points, but if the court has heard enough, I'll also say, I just, I wanted to make a brief point. I have a couple, I have a couple. Oh, go ahead. Might I make, oh, go ahead. I apologize. I couldn't hear the chief judge. Sorry. I said, I have a question too, but I, but why don't you ask yours and then I'll. Okay. Okay. So tell me why this is wrong, Mr. Glover. Classification and priority refer to status in line and the type of visa. And there's no doubt that when it comes to classification and priority, textual language, that family members aren't some fourth category of visas. There's, there's family based, there's employment and there's diversity. There's no branch of this. So if you're getting, if you're, if you fall under this D and you're going to get classified and prioritized along with a one or two or three, because you're the family member of an EB-5 visa recipient, you're treated like that EB-5 recipient with regard to your, your place in line and the type of visa that you get, which goes back to Judge Millett's question. Your, your visa is going to say an EB-5 visa, but text that tells us your place in line and your type of visa doesn't tell us anything about how we count you. And so to figure out how we count you, it was clear in the 1965 act because the counting flowed from your placement under a provision stating that you were subject to the INA's numerical limitations. So that's how we knew. And then Congress in 1990 changed it. They kept the text in terms of describing you, but they uncoupled it from the placement under that provision. To me, that at least strongly suggests that when it comes to counting, something changed because the only thing that was getting you counted before was your text without a kind of catch-all umbrella that was above it. And the plain text talks about an EB-5 qualified immigrant as someone engaging in a new commercial enterprise in which such alien has invested capital. That's 1153B5. And I think we can agree that at least some family members do not engage in a new commercial enterprise investing capital. I mean, if you're a two-year-old child, you're not investing a million dollars in creating 10 jobs. So tell me why that's wrong. So Judge Walker, I would make a couple of points. The first is this goes to the discussion, and I tried to make this clear initially, but in changing 1151A, Congress added the exclusive of aliens described in B. So 1151A used to just set a worldwide cap exclusive of a few things. But instead, they changed A to have exclusive of those in B. So B is those who are not counted in the worldwide cap. The visas- Let me interrupt for a moment so you can address this before I forget to ask. B may or may not be an exhaustive list of aliens not subject to direct numerical limitations. You want it to be considered an exhaustive list. So you've got to explain to me why you think it is. You don't have to do it now, but at some point, please. So can I start with two points on that? As I try, I think I discussed or made clear in response to the statute cited at page 12 of their brief or their reply brief, when Congress did create a new means for immigrant visas that wasn't included in 1151, it had language saying this isn't subject to the caps anywhere in the INA and all of those statutes, making clear it was doing that later with some other provision. But at the time it enacted 1153D and did the overhaul of 1151 through 1153 in the 1990 Act, the new 1990 Act 1151A has exclusive of aliens described in subsection B, aliens in a foreign state or dependent area who may be issued immigrant visas or who may otherwise require the status of an alien lawfully admitted to the United States for permanent residence are limited to. It's that limited to language that says exclusive of B, immigrant visas are limited to and what follows. That's my point, Mr. Glover. I'm reading that not as referring to how we count them, but I'm reading that to referring to where we put them in line and what type of visa we give them. And if I'm wrong about that, please tell me why. So that tells us that you are limited to those three categories and 1151A sets numerical limits of those three categories, the 480,000, or sorry, it's CD and E in 1151. It sets numerical caps for each of those categories, right? And then when you go to 1153 and you look at the caps for EB1 and EB2 and EB3 and EB4 and EB5, that adds up to 100% of the 140 employment-based visas available. So if they aren't going to be counted under their principles of category, they would, I guess, be counted towards the 140, but they might just be blocked out entirely and that wouldn't give them the same order of priority. In order to give them the same order of priority, you have to put them in line in the employment-based immigrant visa category with their principle. And so if they are subject to the worldwide limitations, but they don't have a set aside percentage and the percentage for all of the sections adds up to 100 for both the family-based and the employment-based, then derivatives would be getting not the same status and not the same order of priority, the order of consideration they would lose because they would only get whatever is left over. And I think for the diversity visa applicants, it's a little more straightforward because there you just have a single limited 50,000 number. And so I think that's where 1151, working together with 1153, makes clear that you're taking from this worldwide limit of visas and they've all been allotted. And if you look at the language in EB1 and, sorry, 1153B1 and B3, it talks about allocating and allotting visas in identical language to what was previously used under what was then 1153A1 through 7. And so it's using that similar language that each of these provisions is allocating or allotting a visa. The A9 under the previous provision was nearly identical to what we have now. So we don't think merely eliminating the prefatory language that was in 1153A somehow takes them out of the counting because they are still part of this new three types of immigrant visas in 1153. You said something about diversity being clearer than employment. I just didn't quite catch what you meant. I just meant that the numbers for diversity are a little bit easier simply because in 1153C and D, which set out the worldwide numbers for family-based and employment-based, it has that sort of circular feedback of you can add unused. Sorry. Yeah. And another point, Congress just doesn't hide elephants in mouse holes. And so again, using the math that the conference committee interpreted, their reading is creating about 1,012,500 uncounted visas. And if you look at the legislative history, and I tried to find any legislative history really talking about derivatives, and all I could find was a committee report, the citation, which I can get you, but it was about the previous preference, which is siblings of lawful permanent residents, that that category was oversubscribed for a number of countries. And one of the examples given was, I believe, Korea and the Philippines, the principals were less than 50% of the people. And so maybe they should revise that category to only allow unmarried siblings so that you wouldn't have derivatives because the category was oversubscribed. But I was not able to find any discussion of the desire to create an uncapped category of derivatives. And Congress has been clear since then in creating new categories of immigrant visa or new means of getting an immigrant visa, they're clear when they're exempting you from the numbers in 1151. And so we just don't think that it hid this elephant or this herd of elephants in a mouse hole, because that's a substantial change from the system that had previously limited it at a total of 170 and later 270,000. I'll ask you one follow-up question if Judge Walker does that. I'm finished with my questions, thank you. Thanks for your patience. No, of course. So I think it's related, which is, is there a reason that the prefatory language that the other side relies on in A to C and that was in the 65 Act, is there a reason that it couldn't have been done in D? Or is it just that, I mean, I know your argument is that even though it's not there in D, D still naturally is subject to the caps because of all the structural arguments that you've been making. I guess my question is, did D, is it also your submission that D just wouldn't make, it wouldn't, actually wouldn't have even made sense to carry forward prefatory language in D? I think, so if I could make a couple of points. In the original A, the prefatory language was before all of these provisions and because they then split out A and B and C, they replaced it in each of those. I think Congress could have taken the treatment of derivatives and placed it at the end of A and at the end of B and at the end of C, sort of repeated it in those three places. It didn't. I think if you put the prefatory language at the start of D, it's preference allocation for, but then you would need to, you know, I guess, because each of them are talking about a category of immigrants in 1151A. They're repeating the language family-sponsored immigrants in 201C, which is 1151C's sort of family-sponsored numerical limitation and B. So the D would have said, you know, something like allocation for immigrants for family-sponsored employment-based and derivative who, it would have required changing. I don't know a clear way you could have repeated the identical prefatory language because you're talking about people who are getting their visas subject to three different new categories and I suppose they could have in 1151A added D, you know, derivative immigrant visas as a new category of visas and then put here some prefatory language saying, but you shall be limited to the cap of your principal or some differently worded, but the prefatory language as it was included, I don't think allows or it isn't easily converted there and I would just re-emphasize that when they were placing D, they did it in this section 162 of the 1990 Act of Conforming Amendments. It's also where they place the order of operations and I think I hit on this, but the order of operations really only makes sense if you're getting in line with your principal in line, you know, towards a numbered visa system, not if you're getting an unnumbered visa because then immediately when your principal obtains a visa, you can have the same status. So immediately, you know, there'll be no reason to continue to include that order of consideration language if you weren't meant to be taking from the sort of numbered and capped visas in 1151. Does that answer your question? Was the second part of your question I've forgotten now? No, that covers it. Okay. My colleagues don't have any further questions. Let me make sure then. Well, thank you, Mr. Glover and we'll hear from Mr. Ramos for his rebuttal. Mr. Ramos, we'll give you three minutes. Thank you. Thank you, Your Honor. The first point is on the regulation, Judge Millett's point about the regulation and I heard my colleague mention that the structure of the regulation effectively mirrors the structure of the 1965 Act and I think that's significant because what it means is that the State Department never grappled with the structural change of the 1990 Act. In other words, if what they were doing in the regulation is simply replicating the structure that existed before that structural change, then that's pretty conclusive evidence that they, in fact, didn't grapple with this new issue that the 1990 Act created. And the second point on the regulation is just to address, Judge Walker, the language you were pointing to, the status corresponding to the classification. You know, in section 42.33E, E2, and the status, if what the regulation meant is just to say that they recorded the same classification, they could have just said derivatives obtain the same classification, but instead they say a derivative status corresponding to the classification and that's consistent with our reading that status refers to the lawful permanent resident status and not the particular visa classification. My colleague also mentioned the post-1990 legislative history. To begin, the courts generally accord very little weight to acts that were never passed. But more significantly, my colleague mentioned the Cuban Adjustment Act. Sorry, go ahead on the Cuban Adjustment Act. No, just the Cuban Adjustment Act provides a great historical example of how the State Department can misapply accounting policy for years. After the Cuban Adjustment Act was enacted in 1966, for over eight years, the executive branch misapplied the accounting policy, excuse me, misapplied that statute by counting the Cubans against the worldwide limits. And it was only after eight years that the Office of Legal Counsel in the Justice Department took a second look at this and realized, you know what, we were wrong to count them against the worldwide limits. And they stopped counting them and there was litigation over that. And the history of that is in a case called Silva v. Bell. It's at 605 Fed 2nd 978. And that just, that shows two things. One, that the executive branch can make mistakes in the implementation of these complex provisions. And the other is that Congress doesn't always step in to fix these problems. Mr. Ramos, let me ask before your time's up, and in part because I'm, can you just clarify on the country caps versus worldwide caps? As I understand what you said just before the end of your first argument, I think you were saying that spouses and kids count toward per country caps, but not toward worldwide caps. Is that your position? It's close to that, Your Honor. Our position is that the EB-5, spouses and children of EB-5 investors count against neither the worldwide limits or the per country limits. There are some categories of spouses and children, particularly of the fourth preference special immigrants who count against the per country limits because they obtain their status under subsection 1153B. And if I said that the spouses and children don't do count against the worldwide limits, that was a misstatement, and I apologize. Our central position is, in fact, the opposite, that they don't count against the worldwide limits. Sorry, your reply brief, page 13, footnote 2, says derivatives are directly limited by the worldwide levels. What we mean by that, Your Honor, and I apologize if that wasn't clear, they are indirectly limited in the sense, the government characterizes our position about 1153D as it is. Just tell me what your position is, please. Just, I don't care who characterizes it, just please tell me what your position is. Sure, I'm sorry, Your Honor. Our position. In footnote 2 on page 13 of your reply brief. Let me, let me just pull up the brief, Your Honor, so I can be clear that I'm addressing footnote 2, Your Honor. Page 13. Page 13. There you say they're subject to the worldwide limits, but they just don't aren't, they don't reduce the number of EB-5 visas. That's how I read your footnote. Right. So, what we mean by that, and I apologize if that's not clear, is that they're indirectly subject to the worldwide limits, only in the sense that the principles are subject to the worldwide limits. That was a response to- No, no, your sentence, I'm going to read it to you, is derivatives are directly, not indirectly, limited by the worldwide levels defined at INA 201A. So, that, that's, you're now retracting that, that you're saying they are not limited, or they're indirectly limited? So, I think perhaps that wasn't the most artful way to express the thought, Your Honor, but I think- No, I'm saying, this isn't artful. You said they are directly limited by the worldwide levels. Are you now saying, this is not artfulness, are you saying they are, are they, or are they not directly limited by the worldwide levels? They're, they are only in the sense that derivatives obtain their status by virtue of a principle. What does that mean? In other words, in other words, there is a- How do they count? They, they do not direct, they do not expend EB-5 visa numbers. They do not expend visa numbers that are allocated in Section 201A. And, and I, I, I think- Mr. Ramos, your, your footnote too has two sentences, I think, that directly contradict each other. So, I, I'm with Judge Millett on, I'm, I don't know if she's confused, but I was, I was confused. I am. I, I, I apologize, Your Honors. I, I, our position is that the spouses and children of EB-5 investors do not expend visa numbers, but they are limited in the sense that they rely on a, an EB-5 investor. In other words, they have to be a spouse or child and the, the, the, of an EB-5 investor, and the EB-5 investors are themselves limited by the, the worldwide limits. So, that would mean that the family members themselves are subject to no limit? Right. That's correct, Your Honor. Was that your position in district court? Yes, Your Honor. Okay, because the government's brief says that your position in district court is that they were subject to the country limits. So, the, the, the, the country limit provision, it's, it's a very complicated, complex provision, and the, the ultimate, where we ultimately ended up on the per country limits is that the EB-5 spouses and children do, do not count against the per country limits. That the per and this is the PI decision. While plaintiffs agree that EB-5 derivative spouses and children are counted toward the country cap, they dispute that they are also counted toward the worldwide levels. Was the district court wrong to say that you agree that they are counted toward the country cap there? Yes, our, our position did change from the preliminary injunction briefing at, to the position before this court. The. Did you change for the district court's summary judgment decision? Or is this a new argument here? The argument about, let's see, this is on the per country limits. I believe we, I'm sorry, Your Honor. No, no, go ahead. No, I, I believe that we, we made the argument in the alternative in the district court, but I would have to go back and look at the briefing. I apologize, Your Honor. Okay. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan, Millett, Walker